THE FARMERS' BANK v. ALONZO BURCHARD.

*Banks.　Usury.　Surety.　Application of Payments.　Corporations.　Lex loci contractus.*

The plaintiffs, an incorporated bank in this State, advanced to an individual a sum of money in their bills, marked for identification, exceeding ten per cent. of their capital, and took from him bills of exchange for that amount, drawn by him on another person, payable at sight with five per cent. interest; with an agreement that the circulation of the money so advanced should be protected by the person receiving it, and that from time to time as the bank should redeem the bills, he should furnish them with exchange on New York for the amount of such redemptions, with six per cent. interest on the same; and the money so redeemed was to be sent back to him on the receipt by the bank of the exchange therefor; and further that if the agreement in regard to the circulation and redemption was carried out, payment of the the drafts should not be required for one year. *Held,* that such transaction was a *loan,* and not a purchase of bills of exchange within the meaning of sec. 74, chap. 84, Comp. Stat. p. 493.

In making such loan it was supposed by the plaintiffs' directors that the agreement of the borrower in regard to the protection of the circulation would be carried out; and if it had been, the bank would not have received more than six per cent. interest on their money so advanced; but in consequence of

the borrower's neglect to furnish exchange in payment of all the redemptions by the plaintiffs, the latter's claim upon him for the five per cent. interest expressed in the bill of exchange, and the six per cent. on the redemptions, amounted to nearly ten per cent. upon the original loan; and new notes were executed to the plaintiffs by the borrower for the amount of the original loan computed at such resulting rate of interest, on which new notes, as well as the original paper, the defendant was surety. *Held*, that the original loan was not *usurious*, there being no express reservation of usury, and no corrupt intent to take it.

The new notes were by their terms on ten per cent. interest, a rate, however, which was lawful in Michigan, where they were executed. They were also made payable to A., the plaintiffs' agent, who was sent to Michigan to adjust the claim on the old paper, and who took them, subject to their acceptance by the plaintiffs, in which case the old paper was to be given up. The plaintiffs in accepting the new notes took them with the understanding that they should be operative only for such rate of interest as could legally be recovered upon them, being in doubt whether they could take more than six per cent. *Held*, that so far as the inclusion in the new notes of the excess over legal interest on the original loan was concerned, it was not to be *presumed* that it occurred by such a corrupt intent as is indispensable to *usury;* and that the circumstances and understanding under which the new notes were taken by the plaintiffs, rebutted the presumption of usury, arising from the express reservation of illegal interest upon their face.

In this State a contract affected with usury is valid to every intent, except as to the excess above legal interest.

There is no distinction between individuals and banks in this respect, testing the contract merely by the law prohibiting *usury*, and without regard to the specific prohibition of taking more than six per cent. interest by *banks*, contained in sec. 72, chap. 84, Comp. Stat. p. 492, or the charter of the particular bank in question.

In the absence of fraud or concealment on the part of the bank, practiced upon the defendant, the surety, in regard to the use to which the paper was to be put, the fact that he supposed it ordinary banking paper to be used in the ordinary way of discount, and would not have signed it had he known of the real arrangement between the plaintiffs and the principal, does not relieve him from liability thereon.

*Held*, that the defendant's claim that the original loan had been repaid by the funds furnished by the borrower, to the plaintiffs in the payment of redemptions made by the latter, and a commission of one-half of one per cent. on such redemptions, was not well founded. The contract for the reimbursement of redemptions was not illegal in itself, and the money having been furnished by the borrower for that purpose, and by the plaintiffs applied thereto, the law will not make a different application of it to the payment of the original loan; nor treat the money paid by way of commission on such redemptions as anything else than what the parties intended it

should be, a compensation to the plaintiffs for doing what the borrower should have relieved them from the necessity of doing.

Neither the inclusion in the new notes of more than six per cent. interest on the original loan, nor the express reservation therein of ten per cent. interest, rendered such notes void *in toto*. They were legal to the extent of the original loan computed at five per cent. up to the date of the new notes, and at six per cent. thereafter, and void only to the extent of the illegal interest therein contained and reserved.

The violation by an incorporated bank of the provisions of its charter, and the general banking law, by the reservation of more than six per cent. interest does not forfeit the contract or security, but merely prevents the recovery of the illegal excess of interest.

*Held*, also, that the fact that the original loan was for more than ten per cent. of the plaintiffs' capital and thus in violation of sec. 74, chap. 84, Comp. Stat. p. 493, furnished no ground of defence either to the principal or surety upon the notes.

The rate of interest reserved by the new notes was not in itself contrary to the statute of Michigan; but it was claimed that by the common law of that State, as illustrated by the case of *Orr v. Lacey*, 2 Doug. 230, the reservation by a bank of a higher rate of interest than was allowed by its charter or the laws of the State under which it had its existence, rendered the contract or loan entirely void; and that therefore on the principle that the *lex loci contractus* must govern, such must be the adjudication in regard to the notes in this case, although judged by Vermont law alone they would be void only to the extent of the illegal interest, and by the Michigan statute law alone, not void at all. *Held*, that the rule that the *lex loci contractus* governed, could not be carried to this extent.

*Quere*, whether Michigan was the *locus contractus* of the notes in question.

The case of *Orr v. Lacey* discussed, and shown not analogous to the case at bar.

A bank incorporated in this State, cannot recover more than six per cent. interest for its loans, nor upon securities taken therefor, though the loans may be made and the securities executed in a State where a higher rate of interest is allowed by law.

ASSUMPSIT. The declaration contained special counts on a note and two drafts for ten thousand dollars each, dated at Detroit, Michigan, respectively July 6th, 1853, August 26th, 1853, and September 13th, 1853, signed by Smith, Dwight & Co., payable to the order of Howard and Toms, endorsed by them, by the defendant and other endorsers, and payable with exchange on New York, the note on demand and the drafts at sight, with

Farmers' Bank *v.* Burchard.

interest at five per cent. per annum.  The drafts were drawn on the Metropolitan Bank, New York.

The declaration also contained special counts on three joint and several promissory notes, dated at Detroit, January 6th, 1855, signed by Smith, Dwight & Co., and by the defendant and others, two for ten thousand dollars each, and the other for nine thousand one hundred and eighty-eight dollars and thirty-eight cents, and all payable to Calvin P. Austin, or order, one day after date, at the Peninsular Bank, Detroit, with interest at the rate of ten per cent. per year, and endorsed by Austin.  Plea, the general issue, with a stipulation between the parties that any defence might be shown under it, and trial by jury at the December Term, 1859, of the Addison county court,—PIERPOINT, J., presiding.  All the evidence on both sides was taken subject to all legal objections, besides the specific ones particularly stated.

The plaintiffs introduced in evidence the three notes described in the declaration, dated Jan. 6th, 1855.  The plaintiffs admitted that the defendant was merely a surety on these notes, and had never received any benefit from them, and that the plaintiff was aware of this at the date of the notes.  The plaintiffs also gave in evidence the other note, and the two drafts described in the declaration, and dated in 1853.  These drafts and note were in the defendant's possession in court, being cancelled, and were produced by him on trial, at the plaintiffs' request.

The plaintiffs were chartered by the legislature of the State of Vermont, in 1833; and in 1846 the charter was extended.  Their capital paid in amounted to one hundred thousand dollars.

It appeared from the testimony introduced by the plaintiffs that they received the note and drafts dated in 1853 from Smith, Dwight & Co., in consideration of an advance by the plaintiffs to them of thirty thousand dollars, in three equal installments, one at the date of each of those papers, under an arrangement that the bank was to take five per cent. interest, and that Smith, Dwight & Co. were to give the money so advanced, being marked bills issued by the plaintiffs, a circulation of from three to six months, and were to protect such circulation; that as fast as such money was redeemed by the bank, it was to be sent back in sums of five

hundred dollars or more, to Smith, Dwight & Co., who were to pay six per cent. interest thereon to the plaintiffs, from the time it should be redeemed by the bank until they should send the bank drafts on New York, for the several amounts of money so redeemed and sent back to them; and that it was the understanding between the bank and Smith, Dwight & Co., at the time this arrangement was made, that the note and drafts might run a year if the arrangement was satisfactorily carried out; that on the 20th of September, 1853, the plaintiff and the other endorsers on that paper signed and delivered to the plaintiffs a written agreement to the same effect; that on or about the 30th of August, 1854, the following paper was signed by the endorsers on the above described note and drafts, and among them by the defendant, and was delivered to the plaintiffs:

" To the cashier of the Farmer's Bank, Orwell, Vermont,—

It is understood by us as endorsers, that the drafts drawn by Smith, Dwight & Co.," (describing the drafts then held by the plaintiffs,) " are not to be presented for acceptance and payment immediately, but at the option of the Farmer's Bank at any time after the date of the same, said drafts being upon interest from date at five per cent."

The plaintiffs called Davis Rich, one of their directors, as a witness, who testified that just before Calvin P. Austin, their president, went to Detroit, as hereinafter mentioned. to make a settlement of the debt against Smith, Dwight & Co., the defendant and others, arising out of the note and drafts then held by the bank, and before the notes dated in 1855, described in the declaration, were taken, the witness called on the defendant who resided in this State, to see if, in case a settlement was made and new paper given by Smith, Dwight & Co. to the plaintiffs, the defendant would sign it; that the defendant said he would, and remarked that he supposed he was liable on the old paper for about thirty thousand dollars, but that he did not want to make himself liable any further than he then was; and that the defendant then executed and gave the witness a writing to the effect that he was liable on the old paper, and agreed to be liable on any new paper the plaintiffs should take therefor in Michigan;

and that when the new notes were brought from Michigan by Austin, as hereinafter stated, the witness took them to the defendant for his signature, and that the defendant signed them.

The plaintiffs read in evidence the statutes of the State of Michigan, relating to rates of interest and usury, by which it appeared that seven per cent. was the legal rate of interest in that State when no rate was stipulated, but that the parties to a contract might lawfully stipulate in writing for the payment of any rate of interest not exceeding ten per cent.; and further that the reservation of usury did not invalidate the contract, but only prevented the recovery of the usury.

The plaintiffs also introduced evidence tending to show that Smith, Dwight & Co. did not protect the circulation of the money furnished them according to their agreement, and that in conse-quence of their neglect to do so, a claim accrued in the plaintiffs' favor against them for interest at six per cent. on the plaintiffs' redemptions of the marked currency, and exchange at the current rate in New York, one-half of one per cent. amounting at the date of the new notes to one thousand thiry-four dollars and six-teen cents ; that C. P. Austin was sent by the plaintiffs to Detroit in January, 1855, to adjust the plaintiffs' claims against them on the old notes ; that upon such adjustment it was found that upon the terms of the contract under which those notes were executed there was then due from Smith, Dwight & Co. to the plaintiffs twenty-nine thousand one hundred and eighty-eight dol-lars and thirty-eight cents, including seventy-five dollars, for the expenses of Austin's journey to and from Detroit ; that Austin received at Detroit from Smith, Dwight & Co. the three notes dated January 6th, 1855, described in the declaration, with the understanding that if they were accepted by the plaintiffs on his return to Vermont, the old notes were to be delivered up to Smith, Dwight & Co., but otherwise the new notes were to be returned.

The plaintiffs also called as a witness one Bull, their cashier, who testified that if the original contract made in 1853, with Smith, Dwight & Co. had been carried out according to its terms, it would not have resulted so that the plaintiffs would have received more than six per cent. on the thirty thousand dollars

advanced to Smith, Dwight & Co., under that contract, and that his own expectation at the time of making the loan was that the whole interest to be derived thereby, would not exceed six per cent. ; that if the marked money had got the circulation Smith, Dwight & Co. had said and agreed it should, the interest would not have exceeded six per cent. but that it came back so fast that the interest on the redemptions amounted to nearly five per cent. for the whole time.

The plaintiffs also called as witnesses four of the five directors of their bank, (and the only ones who acted in connection with the whole transaction out of which grew the notes declared on,) who testified that in making the loan to Smith, Dwight & Co., and taking the original notes they had no intention or expectation of getting more than six per cent. interest by the transaction, but that they acted in good faith, believing that the other parties would carry out the arrangement on their part, and that if they had done so, the bank would not have received more than six per cent. ; that Mr. Austin, who was sent to Detroit by the plaintiffs to obtain payment or a settlement of the old notes, brought back the three new notes which he took in Detroit, and which were there signed by all the parties thereto except the defendant and one other surety, who both signed them afterwards in this State ; that when these three new notes came before the plaintiffs' directors for their acceptance or rejection, according to the terms of the agreement under which Austin received them, the question arose among the directors as to what rate of interest they could legally take upon these notes ; that there was a difference of opinion among them on this question, some thinking they could take six and others ten per cent., but that they all agreed they could lawfully take six per cent., and that the notes would be good for that rate ; and that it was finally decided to accept the notes and take such rate of interest as the law would allow them to take, and without any intention to take any other.

The plaintiffs also offered the deposition of one Rogers, tending to show that the original drafts were each duly presented and protested for non-payment, and notice thereof given to all the endorsers on the 26th of August, 1854, and the 15th of Septem-

ber, 1854, respectively. To the admission of this deposition the defendant objected on account of the want of reasonable notice to him of the time and place of taking the same. Under the decision of the supreme court, it is immaterial to state this objection with more particularity. The county court overruled the objection, and admitted the deposition, to which the defendant excepted.

The defendant read in evidence the deposition of S. T. Douglass, late reporter and judge of the supreme court of the State of Michigan, to the effect that the case of *Orr* v. *Lacey*, as reported in 2 Douglas' Rep. p. 230 to 255, inclusive, is the true exposition of the law of that State upon the subjects therein considered. The points at issue in that case are sufficiently adverted to in the opinion of the court in the present case.

The defendant himself testified that when he endorsed the original drafts and note in 1853, he supposed they were banking paper, and that he had no knowledge of the arrangement between Smith, Dwight & Co. and the plaintiffs, disclosed by the evidence. He further offered to show that when he endorsed the first draft, he endorsed it supposing it was to be used in the ordinary way of discount to renew the first note, and he had no knowledge that it was to be used for any other purpose, nothing being said to him on the subject. And he also offered to show that he endorsed the second draft, supposing it was to be used to take up the first draft. To the admission of this testimony the plaintiffs objected, and the court excluded it, to which the defendant excepted.

The defendant further testified that if he had had knowledge of the arrangement above stated, between the plaintiffs and Smith, Dwight & Co., he would not have signed the original note or drafts ; that he did not know that that paper was not taken up until about a year after they were executed, and that he knew nothing of such arrangement until after this suit was brought ; that he signed the papers dated respectively September 20th, 1853, and August 30th, 1854, in regard to the presentation of the note and drafts, without reading them or knowing their contents ; that Davis Rich asked him if he would sign new notes

23

in place of the old drafts and note, if the plaintiffs should arrange the matter by taking new notes, and that he replied that he would do so, that he supposed he "was in for it," but did not want to make himself any more liable than he then was, and that Rich said he did not wish him to.

The defendant requested the court to charge the jury as follows :

1. That there could be no recovery on the drafts and note executed in 1853, because they were voluntarily given up to the principals by the plaintiffs, and cancelled, without any mistake of fact or any fraud.

2. That, upon the evidence, the defendant was not duly charged as endorser.

3. That the original arrangement, as made and carried out between the plaintiffs and Smith, Dwight & Co., was upon the evidence contrary to law and the charter of the plaintiff, illegal and void ; and therefore that the securities given in furtherance of the same were void also.

4. That if the object of the tranaction on the part of the bank was to hold said drafts and note in the way it did hold them, and this was unknown to the defendant, and he signed them only for ordinary discount, and would not have otherwise signed them, then the bank acquired no valid interest in them, as against him.

5. That upon the evidence, the payments by Smith, Dwight & Co., must be applied to these drafts and note, and when the sum thereof was once returned, as to the defendant, they became extinguished, if he did not make them for a continuing security, and that on this point the burden of proof was on the plaintiffs to show that the defendant agreed to be bound in the continuing way claimed by the plaintiff.

6. That the statute was violated in thus making a debt exceeding the statute limits of ten per cent. of the capital, and therefore, although the bank might perhaps recover its money from those who had it, no recovery could be had from this defendant.

7. That the first notes, in connection with the evidence of Bull, as to the established rate of exchange, could not be enforced.

8. That the new notes being solely based on the old transaction, were invalid, for the same reasons existing as to the old securities.

9. The old note and drafts having been paid, as to this defendant, the new notes made in ignorance of the facts, were without consideration.

10. That they were upon the evidence illegal and void ; *a.* as found on an illegal consideration ; *b.* as without consideration ; *c.* as in violation of the laws of Michigan ; *d.* as in violation of the laws of Vermont.

11. That any act of recognition by the defendant of the paper as binding on him, to be available to the plaintiff, must have been with a knowledge of the facts on which he would have a right to defend, so as that he understood that he was waiving a right which he possessed; and that on this point the evidence was all one way in favor of the defendant.

But the court declined to charge the jury as requested by the defendant, but directed a verdict for the plaintiffs for the amount due upon the three notes executed in 1855, at six per cent. interest, to which direction and the refusal of the court to charge as requested, the defendant excepted.

*J. Maeck* and *Geo. F. Edmunds,* for the defendant.

1. The original arrangement was *ultra vires.*

The corporation had no authority whatever to make a contract of that description. "Being a mere creature of the law it possesses only those powers which the charter of its creation confers upon it, either expressly or as incidental to its very existence."

*Head* v. *Providence Ins. Co.,* 1 Pet. Cond. 371 ; *Dartmouth College* v. *Woodward,* 4 Pet. Cond. 586 ; *Dandridge* v. *Bank of U. S.,* 6 Pet. Cond. 440; *Bank of U. S.* v. *Owens,* 2 Pet. 527 ; *Batty* v. *Knowles,* 4 Pet. 152 ; *Bank of Augusta* v. *Earl,* 13 Pet. 587 ; *Runyon's Lessee* v. *Coster,* 14 Pet. 128 ; *Bank of Chillicothe* v. *Swayne,* 8 Ohio ; *Canal Bank* v. *Reeds,* 11 Ohio 489 ; *Creed* v. *Com. Bank,* 11 Ohio 500 ; *Miami Express Co.* v. *Clark,* 13 Ohio 1 ; *N. Y. Ins. Co.* v. *Ely,* 5 Cowen. 560 ; *People* v. *Utica Ins. Co.,* 15 Johns. 358 ; *Mutual Benefit Life Ins. Co.* v. *Davis,* 2 Kern. 569 ; *New York Fire Ins. Co.* v. *Sturgess,* 2 Cowen 664 ;

*N. Y. Fire Ins. Co.* v. *Ely,* 2 Cowen 679 ; *Orr* v. *Lacey,* 2 Doug.
M. R. 230 ; *Beach* v. *Fulton Bank,* 3 Wendell 573 ; *Life & Fire
Ins. Co.* v. *M. F. Ins. Co.,* 7 Wend. 30 ; 7 E. L. & Eq. 505,
*East Anglian Co.* v. *Eastern Co.* ; *Bangor Boom Co.* v. *Whiting,*
29 Maine 123 ; 4 Wend. 484 ; 2 Sandford 25—26 ; Angell &
Ames on Corp. 230 ; *Hood* v. *Railroad,* 22 Conn. 502 ; *Penning-
ton* v. *Townsend,* 7 Wend. 200.

II. This arrangement for a year to keep out thirty thousand
dollars of the notes of the Bank, at five per cent. with six per
cent. interest and expressage and commissions on redemptions
was, as we conceive, a direct violation of the 71st, 72d, 73d and
74th sections of the bank act of 1840.

1. It was far from " discounting on banking principles." It
was an arrangement contrary to the policy of the law — and a
species of fraud upon the public as well as the parties.

It was worse than a loan of the bank notes upon the terms
that they should not be put into circulation at all, for the bank
was to get the interest on the sum advanced, running all the time,
and profits, interest, commissions and expenses in doing what the
law made it its own duty to perform at its own expense.

2. Although the directors did not *expect* that the *interest* would
exceed six per cent. in the whole, they must be taken in law to
intend the natural and ordinary consequences of their own acts,
which plainly was to secure more than six per cent. interest.

3. Again, the note and drafts were payable by their terms on
demand with five per cent. interest, and with exchange on New
York, (one-half of one per cent.) and in this respect in the ordin-
ary course of business operations, the rate of interest secured
would be more than six per cent.

4. It may be attempted to claim that the act of 1836, which
repealed the usury act of 1822, and enacted the one now in force,
by some implication, imposes upon the bank act of 1840, a con-
struction like its own. This we deny. The general usury law
was passed four years *before* the bank act, and hence if either
act is to affect the other it must be the *later* one.

The fact that a *general* law was already in operation on the
subject of interest, is a circumstance to show that the act of 1840
on that subject was intended to bring banks under a more strin-

gent rule than men in general; and the wise policy of that is obvious.

Again, the act of 1840 uses different and more comprehensive language in its prohibition than does the act of 1836. The act of 1836 says that no person shall " *take* " more than six dollars, &c.; the prohibition being against the *actual taking ;* while the act of 1840 forbids a bank to *demand* or receive, &c.; thus *prohibiting the making any contract for*, *or endeavoring* to obtain more than six per cent. Whenever it has been held that banks were only affected like persons under the general usury laws, it has been upon phraseology quite different from that of our statutes.

5. The arrangement, and all done under it, was a palpable violation of the 74th section of the act. This debt was knowingly made and continued to an amount three times as large as that allowed by the statute.

6. The charter of this bank, and the act relating to banks, are not mere bagatelle, made to increase the gains of reckless bankers by frightening conscientious ones. They are made for the security of the public currency, and the protection of private persons against the extortion of moneyed corporations, and as such they ought to be enforced to that end.

It is not a matter of doubtful application or construction. The language is plain and simple, and it either means nothing, or it absolutely prohibits the species of transactions referred to.

7. And when it is intended that a violation of these laws shall not prevent civil recoveries, the acts so provide in plain terms.

The four sections above alluded to, are followed in the act of 1840, by what is, in the Compiled Statutes, sec. 81, which prohibits the issuing of bills beyond a limited amount, and then provides a saving clause that a violation of that prohibition should not be construed to avoid any contract, &c., of the bank.

Violations of these acts are punished by heavy penalties. Smith on Cont. 123 ; *Poplet* v. *Stockwell*, 2 M. & W., 21 E. C. L.

8. It is not *merely*, then, from want of *power* under the charter that this arrangement, and the acts done under it, cannot be upheld, but also because they are *positively forbidden by express law*.

The decisions on this point are numerous, extending to almost every variety of affairs. See cases cited; and see also *Wheeler* v. *Russel*, 17 Mass. 258; *Talmadge* v. *Pell*, 3 Seld. 328; *Leavitt* v. *Palmer*, 3 Comst. 19; *Swift* v. *Beers*, 3 Denio 70; *De Groat* v. *Van Dusen*, 20 Wend. 390; *Springfield Bank* v. *Merrick*, 14 Mass. 322; Smith on Con. 152; *Langton* v. *Hughes*, 1 M. & S. 593; *Holman* v. *Johnson*, Cowp. 343; *De Begnis* v. *Armstead*, 25 E. C. L. 47; 3 Vesey 73, Exparte Mather; *Lightfoot* v. *Tennant*, 1 B. & P. 551; Chitty Con. 597 *et seq.*; *Law* v. *Hudson*, 11 East. 300; *Lyon* v. *Ide*, 1 D. Chip. 46; 37 E. L. & Eq. 187, *Bartlett* v. *Atheneum Co.*; 37 E. L & Eq. 590, *Laughton* v. *Haynes*.

9. Nor is it necessary that such contracts should be *declared* void by the act. 21 Vt. 184, *Territt* v. *Bartlett*.

10. Nor that a penalty should be prescribed for the act prohibited.

11. A proper attention to the distinction between contracts to do something illegal, or the necessary and usual effect of which will be an illegal act, and contracts which of themselves are perfectly lawful, but in the execution of which something is done illegally, *not contemplated in nor flowing from the contract*, will reconcile the cases into substantial harmony. Smith on Con.; *Tracy* v. *Talmadge*, 14 N. Y. 162 and note. See notes to *Collins* v. *Blantern*, 1 Sm. L. C. 153.

III. The case shows that this arrangement, under which the note and drafts were taken, was wholly unknown to the defendant, and that he signed the paper supposing it was to be used as ordinary discount paper, and to renew.

On these facts he, as a surety, was not bound; he could truly say *in hœc fœdera non veni*, nor would he have entered into such an arrangement had he known it. *Pidcock* v. *Bishop*, 3 B, & C. 605; 5 D. & R. 505; Theobald 147; *Stone* v. *Compton*, 35 E. C. L. 57; *Small* v. *Ourier*, 23 E. L. & Eq. 633; *Bank of U. S.* v. *Elling*, 11 Wheat. 59; Story's Eq. 148, 324, sec. 383, 214–215; 14 Vt. 260, *Richmond* v. *Standcliffe*; 2 Am. L. C. 284; Chit. on Cont. 8 ed. 459, see note; *Owens* v. *Homans*, 25 E. L. & Eq. 1.

IV. Nor did his *subsequent* signing the paper waiving protest

until a year, affect this question, for he *did that in entire ignor-ance of the facts,* as well as in ignorance of the effect of the paper he so signed.

V  The bank had no right to hold the paper as against him for any other purpose than the ordinary and usual one of regular discount; and therefore when, as the case shows, the identical money advanced by the bank had been more than twice repaid, the defendant was no longer bound, and no act of the bank in again remitting the money to Smith, Dwight & Co., could continue his liability.    30 Vt. 148, *Bank of St. Albans* v. *Smith;* 36 Maine 179, *Franklin Bank* v. *Cooper;* 31 Vt. 701 ; *Kirby* v. *Duke of Marlboro,* 2 M. & S. 18.

VI.  The defendant was not charged as an endorser on the paper.

VII.  The giving the new notes, under the circumstances stated in the bill, was no waiver of want of due demand and notice, for the new notes were signed on the express understanding that the defendant's liability was not to be increased thereby.    The requests of the defendant fully embodied the law on that point.

VIII.  Nor was such act any waiver of the other defences of discharge, for the same reason, and also because the defendant was kept ignorant of the facts on which such defences would arise.

IX.  The question of the right to *now* recover on the old paper does not arise on this hearing, further than as it regards the *consideration* for the new, and hence the effect of the voluntary cancellation and giving up of the old papers, need not now be discussed.

We think the foregoing points and authorities demonstrate that the defendant was not legally bound to the plaintiff on the old paper when he gave the new.

X.  The new notes then were given without any consideration, and, upon the evidence, cannot be regarded as binding on the defendant for that reason.

XI.  But the new notes are, in connection with the fact of the ownership of the bank, void of themselves.

The illegal misdoings of the plaintiff finally in them reached a consummation of undisguised and undisguisable turpitude.

The funny bagatelle of the directors in their counting-room in speculating upon *how much* they could legally get as interest on these notes, does not improve the transaction, either morally or legally.

These notes were void:

1st. As a violation of the *charter* of the plaintiff, which prohibits it from *demanding* or receiving more than six per cent. interest.

2d. As in violation of the bank act upon the same subject.

3d. As containing, confessedly, the five per cent. and one-half of one per cent. exchange on the old paper, together with six per cent. and commissions (one-half per cent.) on the redemptions, making much more than six per cent. on the original sum.

4th. As on their face bearing a promise to do what the law forbids.

And in this respect the contract is entire, and it cannot stand as a promise to pay the principal only.

The plaintiff can recover against this defendant *only* by force of the very contract contained in the paper, for he has had no benefit from it, and is liable in no other way.

This contract has to be, therefore, and *is declared on as an entirety*, and the court cannot render a judgment for the plaintiff upon these counts except in *"modo et forma,"* and so affirm the legality of the promise.

The authorities on this point are numerous and pointed. 15 Pick. 159, *Loomis* v. *Newhall*, and cases cited.

Could judgment have been given for the plaintiff on demurrer in such a case?

The very ground on which the court directed the verdict at *six* per cent., when the contract was for *ten*, and when the law of the place of payment was *seven*, is repugnant to any right to recover at all by *force of the instrument*. Whether an action might be maintained for the money actually advanced against the parties who actually received it, is a different question.

5th. By the laws of Michigan, the place of the principal execution, and the place of performance, the rates are clearly void. *Orr* v. *Lacy*, 2 Doug. (Mich.); 2 N. H. 42, *Houghton* v. *Page*; 19 N. Y. 436, *Everett* v. *Vendryes*; 14 Vt., *Pecks* v. *Mayo*; Story's

Conflict of Laws, sec. 242 ; 1 Johns. Cases, 139 ; 2 Johns. 235 ; 8 Johns. 189 ; 4 Cowen 508 ; 1 Johnson 94 ; 4 id. 285 ; 8 id. 89.

XII. The court directed a verdict for the plaintiff for about twelve hundred dollars more than it was pretended the plaintiff ever had any claim on the defendant for ; being the balance of general account and Austin's expenses, and which was included in these notes without the knowledge or consent of the defendant.

XIII. The court denied our right to go to the jury upon the evidence, the circumstances of which tended to prove :

1st. That the original paper was wrongfully applied to a purpose not contemplated by the defendant, and out of the usual course of bank transactions.

2d. That in spite of the disavowal of the directors the original arrangement was corrupt.

3d. That the whole facts of the affair were *concealed* from the defendant.

4th. That he signed the papers as to non-presentment of the drafts, without knowing their contents, and that he never waived any right that he had.

*Edward J. Phelps and E. N. Briggs,* for the plaintiffs.

The plaintiffs are entitled to recover on the new notes.

If the taking of the notes under these circumstances could be regarded as "*a loan or discount*," it would not be such a violation of the charter as would preclude a recovery upon them.

The notes, as running to Austin, were valid by the law of Michigan. Mr. Austin neither was, nor professed to be, authorized by the Bank to receive them, or to adopt this rate of interest, but it was expressly agreed that the directors were to accept or reject them at their pleasure. If not received, Mr. Austin became personally responsible for their return. It was, therefore, in the subsequent acceptance of the notes, if at all, that the bank transcended their powers. And the case distinctly shows, that the notes were received by the directors in the belief that the reservation of interest thereon was legal, but if not, that the notes would be valid for the principal and six per cent. interest, and with the intention only to demand upon them such interest as should be lawful for the bank to receive.

Can the proposition be seriously insisted on, that this avoided and discharged the whole debt?

a.  There was no acceptance of the notes in point of fact, as reserving a greater rate of interest than the bank was, under the circumstances, authorized to take.

b.  There was no intent to violate the charter, or to receive higher interest than the law allowed.

In cases of usury, the intent to violate or evade the law is always held material to the offence.   An unintentional excess, or one that takes place under such circumstances that it is reasonably regarded by the parties as right, is never sufficient to sustain the plea of usury.   Ord on Usury 37 ; *Bank of U. S.* v. *Waggoner*, 9 Peters 378 ; *Bank of U. S.* v. *Owens*, 2 Peters 526 ; *Conger* v. *Tradesmen's Bank*, Hill & Denio 34 ; *Marvine* v. *Hymans*, 2 Kernan 233 ; *Bull* v. *Rice*, 1 Selden 315 ; *Stevens* v. *Davis*, 3 Metcalf 211 ; *Bank of Orleans* v. *Curtis*, 11 id. 359 ; *Kimball* v. *Boston Athenaeum*, 3 Gray 225 ; *Duvall* v. *Planter's Bank*, 7 Gill & John. 44 ; *Williams* v. *Reynolds*, 10 Md. 57 ; *Bank of Burlington* v. *Durkee*, 1 Vt. 399 ; *Corlies* v. *Estis*, 31 id. 653.

c.  A loan at a higher rate of interest than six per cent. made where the law authorized such higher rate, would not be a violation of the plaintiffs' charter.

2.  Even though the reservation of ten per cent. interest on these notes be considered as a clear excess by the plaintiffs of the authority conferred by their charter, the notes are not thereby invalidated, but the principal and legal interest may be recovered in an action upon them.

Such is the general rule applied in this state to usurious contracts.   Even in cases of admitted and intentional infraction of the usury law, it is held that the right to recover the debt and lawful interest may be enforced by an action on the very note in which the usury is included.

If then, an intentional violation of a general penal statute does not avoid the note, how can such a consequence follow the unintentional and harmless excess, in a doubtful case, of the restriction as to interest imposed upon a corporation by its charter ? No argument can reconcile the two propositions.

That a bank may recover on a note reserving a greater rate of

Farmers' Bank *v.* Burchard.

interest than is authorized by the charter, has been expressly decided in Connecticut. *Loan Co.* v. *Towner*, 13 Conn. 249 ; 28 Penn. 379 *et seq.*; *Ib.* 383 ; and in Mississippi, *Planter's Bk.* v. *Sharp*, 4 Sm. & Marsh 75 ; 5 U. S. Dig. 904 ; *Knox* v. *Bank of U. S.*, 27 Miss. (5 Cush.) 63 ; 15 U. S. Dig. 553 ; and in Massachusetts, in a case precisely similar to this, under a statute which imposed a penalty on the bank for exceeding the rate of interest fixed by the charter. *Quinsigamond Bank* v. *Hobbs*, Sup. Ct. Mass., Oct. 1858, Law Reporter for Jan. 1859 ; *Fleckner* v. *Bank of U. S.*, 8 Wheaton 338 ; *Bendel* v. *Isaac*, 13 Maryland 203, and app. p. 643 ; *Harris* v. *Runnels*, 12 How. S. C. 84 ; *Graves* v. *Houghton*, 15 Pet. 449.

Certain western cases have been produced, which are apparently to the contrary, though distinguishable from the present in several important features. They had their origin in the tumult of popular indignation against banks, which formerly prevailed in several of the western states, and which led in some instances to the insertion of special clauses in their constitutions, prohibiting all banks and banking within their limits. These decisions cannot be reconciled either with legal principles or with the current of judicial determination ;—far less with honesty or sound public policy. They are not authority in this court, and will cease, as civilization advances, to be authority where they were made.

3. This case is not to be governed by the law of Michigan.

The foremost of the cases just alluded to, is *Orr* v. *Lacey*, which the witness Douglas testifies, was decided by a Court in the State of Michigan, in the year 1845, and has not yet been overruled. This is relied on, not as containing any legal principle which this court would be likely to follow, but as showing the law of that State, which it is claimed must control the present case.

Independent of the important question, whether that decision really justifies the assumption that the present law of Michigan is there laid down, the defendant's proposition cannot be maintained.

*a.* That is not the *lex loci contractus.*

*b.* But even treating the law of Michigan as the law of this

contract, it would by no means determine the question under discussion.

It is true that the *lex loci*, when ascertained, will control the contract and its incidents. But the question how far the Courts of one state will enforce a contract made in another, and objected to as in contravention of a statute or charter in force where the action is brought, is one which affects the remedy, and will always be determined by the *lex fori*. Story's Conflict of Laws, sec. 556–7, 569.

It is not to be tolerated, that in an action brought here, by a Vermont corporation, the consequences that are to follow a violation of its charter, are to be regulated by the law of a foreign State. If such were the rule, the construction of the charter, and the result of transgressing it, would depend entirely on the state in which the particular business in question was transacted.

The principle of comity, upon which alone the law of foreign states is recognized, has never been carried so far.

4. The validity of the new notes as against the defendant, does not depend upon his liability upon the old ones.

There is no reasonable pretext for claiming that the old paper was void as against the principals, and if not so void, the new notes constituted an independent contract, founded upon a legal consideration,—the debt of the principals to the plaintiffs for which the defendant became surety.

It is not charged that any fraud or misrepresentation was practiced upon the defendant to induce him to sign the new paper. Much less was there any contract that unless he was liable on the old, he should not be liable on the new. How far he might have been influenced in signing the latter, by the supposition that a recovery could be had against him on the former, is obviously, in the absence of fraud, of no consequence.

5. If the new notes are regarded as void, the plaintiffs can resort to the old note and drafts against the same parties, counted on in the declaration. If the transaction in which they were given up, is void on the one side, it must be void on the other. That they were cancelled upon a supposed payment that turns out to be no payment, does not discharge them. It is as if they were paid in counterfeit or void bills. *Blodgett* v. *Bickford*, 30

Vt.; *Hagar* v. *Wheeler*, 8 Cowen 77; *Reynolds* v. *French*, 8 Vt. 85.

6. If recourse is had to the old paper, the liability of the defendant upon it is unquestionable.

1. There was no reservation upon these notes of usurious or unlawful interest.

The arrangement under which the loan was made, was shown by full and uncontradicted evidence, to have been entered into by the plaintiffs in the regular course of business, in perfect good faith, and in no respect as a cover for usury. Had it been carried out by the other parties, as the plaintiffs expected and desired, they would not have received more than six per cent. That they did in fact realize more, under these circumstances, does not render the transaction usurious, or a violation of the charter. The unlawful intent and purpose are wanting. *Northampton Bank* v. *Allen*, 10 Mass. 284.

2. Nor was the transaction in question in any other respect a violation of the plaintiff's charter, or contrary to the ordinary principles of Banking.

Such agreements are very common, are not prohibited by the charter nor by any other law, have never been held illegal, nor is there any reason why they should be. *Northampton Bank* v. *Allen, supra; Fleckner* v. *Bank of U. S., supra;* 7 Gill and John. 44; 10 Maryland 57; 11 Met. 359; 3 Gray 225.

3. The provisions of the general banking law, restricting single loans to ten per cent. of the capital, does not apply to such a transaction as this.

4. If the three objections last noticed were well founded, they could not avail the defendant as a defence to this suit. *Bruce* v. *Hawley*, 31 Vt.

Though the public authorities might proceed against the plaintiffs, or revoke their charter, on account of its violation, the defendant would not be authorized to confiscate their property. *Little* v. *O'Brien*, 9 Mass. 423; *Fleckner* v. *Bank of U. S., supra.*

5. The claim that the drafts and note were applied by the plaintiffs and the principals to any different purpose from that intended by the defendant, is effectually disposed of by the papers executed by him, dated September 20, 1853 and August 30, 1854.

---

---

These show full notice to him of the whole arrangement, and his explicit assent to it throughout.

If he signed these papers without reading them, as is now pretended, he is not the less bound by their contents in the absence of fraud, and after they have been received and acted on by the plaintiffs in good faith.

BARRETT, J. This is an action of assumpsit, in which the declaration contains special counts on a note and two drafts for ten thousand dollars each, dated respectively July 6th, 1853, August 26th, 1853, and September 13th, 1853, payable presently at five per cent. per annum, to which the defendant was party merely as surety ; on which paper, at the respective dates, the plaintiff advanced to Smith, Dwight & Co., of Detroit, Michigan, said sums of money, under an arrangement previously made that said Smith, Dwight & Co. were to have the money for a year, giving it circulation, and providing for its redemption. The declaration also contains special counts on three promissory notes dated January 6th, 1855, made payable to C. P. Austin or order with interest at the rate of ten per cent. per year, dated at Detroit, and payable at the Peninsular Bank in Detroit, to which the defendant is party merely as surety. Said last three notes were taken upon a settlement of the balance due for the money originally advanced, and the account that had accrued for charges and interest on redemptions made by the bank, which Smith, Dwight & Co. had agreed and were bound to make.

On the acceptance of said last three notes by the bank, the original note and drafts were given up to be cancelled. On the 20th of September, 1853, the sureties on said original drafts executed a paper to the plaintiff, certifying that it was understood by them, that said drafts were not to be presented for acceptance and payment until one year from their respective dates, unless said Smith, Dwight & Co. should fail to redeem the currency for which said drafts were given, agreeably to an understanding between said Smith, Dwight & Co. and said bank ; and on the 30th of August, 1854, they executed another similar paper, that it was understood that said drafts were not to be presented for acceptance and payment immediately, but at the option of the

said bank at any time after the date of the same. During all the time of the transactions involved in this suit, the defendant was, and ever since has been, a citizen and resident in Vermont; the principals and other sureties, excepting Orville Smith, being citizens of Michigan. Said C. P. Austin, to whom said new notes were made payable, went to Detroit as agent for the bank to make some settlement of said transactions, and get pay or security, if possible, for the balance due the bank. Previous to his going, the defendant was called upon by Judge Rich, one of the directors of the bank, in reference to the proposed effort at a settlement, on which occasion the defendant agreed, in case the matter should be settled by taking new notes for the unpaid balance, for which he was liable, he would sign such notes as surety. Said Austin proceeded to Detroit and effected a settlement, and, failing to get pay, he took said new notes, signed by the parties residing there, upon the understanding, that if, after being signed by the defendant, the bank should ratify the settlement and receive the new notes, the original note and drafts should be given up to be cancelled; otherwise the new notes were to be returned. The defendant did sign the new notes, and they were accepted by the bank, and the original note and drafts were given up to be cancelled.

When said new notes came before the directors for their acceptance or rejection, according to the agreement between said Austin and the parties residing in Michigan, the question arose amongst the directors as to the rate of interest that the bank could legally take upon said notes. There was a difference of opinion, varying between six and ten per cent.; but they all agreed that it would be lawful to take six per cent, and that the notes would be good for that; and they decided to accept them, and take such interest as the law would allow the bank to take, and without any intention to take any other.

Owing to the failure of Smith, Dwight & Co. to provide for the redemption of the original advance of thirty thousand dollars, as they had agreed, the bank had charged interest on such redemptions that had been made by it, in pursuance of the original understanding with Smith, Dwight & Co.; so that, with the five per cent. per annum on the principal sum, it would

receive more than six per cent. in the whole; and in said settlement, such interest on said redemptions was reckoned and embraced in the principal sum for which said new notes were given, as were also charges for expenses in transmitting money by express, in carrying on the business between the principal parties. There were also embraced in said settlement some items of charge not connected with, or growing out of, said loan of thirty thousand dollars. At the time the defendant signed said new notes, he had no knowledge that said interest on said redemptions, or said expenses, or said other charges, were to be or were reckoned as aforesaid, and embraced in said settlement and new notes. The case of *Orr* v. *Lacey*, reported in 2 Doug. Mich. Reps., decided in 1848, was proved on the trial, to show what is the law of Michigan as to the effect of transcending its powers by a corporation in making contracts. The statutes of Michigan on the subject of interest, and on the subject of unauthorized banking, &c., were also proved.

On all the evidence in the case, after argument by counsel upon the law applicable thereto, the county court directed the jury to return a verdict for the plaintiff for the amount of the new notes at six per cent. interest; to which the defendant excepted, as also to various decisions of the court in admitting and rejecting evidence, and in not ruling the law to the jury conformably to a series of written requests.

This brief statement of the leading facts of a voluminous and complicated case, requiring attentive study in order to a full comprehension of all its details, may, with what is further stated in the course of the opinion, render intelligible the main points raised in the argument and now decided.

The original transaction between the bank and Smith, Dwight & Co. must be regarded as a loan, and not in any part a purchase of bills of exchange, in the sense of the banking laws of this state. The evidence shows it to have been so designed by the parties. The whole sum was to be advanced in currency, and, upon the terms of the arrangement, it was to be held for a year, and its current redemption in Boston was to be provided for by Smith, Dwight & Co. The note of July 6th, 1853, the draft of August 26th, and of September 13th, 1853, for ten

thousand dollars each, given upon the advance of said respective sums in pursuance of said arrangement, were made payable presently; but the paper of September 20th, 1853, shows that the drafts were "not to be presented for acceptance and payment until one year from their respective dates, unless said Smith, Dwight & Co. should fail to redeem, etc."

R. C. Smith in his deposition testifies, "that said note and drafts were to run one year from the date of each, provided the redemption was protected by us."

The two drafts were as much a part, and in performance of the arrangement as was the note for ten thousand dollars. These drafts, then, cannot be regarded as falling within the exception, as to the purchase of bills of exchange, to the prohibition of a bank from permitting any person, company or corporation to become indebted in a greater amount than the sum of ten per cent. on the capital stock paid in.

Such was not the understanding of the parties when the original arrangement was made, and the claim now that such should be the view in which those drafts are to be regarded, would seem to be a kind of afterthought, in the hope thus to avoid any ground of objection that might exist in respect to them in that prohibition of the statute.

The ultimate question is, whether the plaintiff is entitled to hold its judgment rendered by the county court. The leading grounds of objection to the judgment go to the right of the plaintiff to recover at all, for any cause of action asserted in the declaration, or on the trial in the county court. The immediate question is, whether the plaintiff was entitled to recover upon the new notes,—the court having directed the verdict upon them, in exclusion of the original note and drafts.

It is objected against the plaintiff's right of recovery on the new notes, that they were given upon, and embraced a consideration affected with usury; that the original transaction of loaning the money was *ultra vires*, and the securities taken thereupon were void as contracts, and imposed no liability on the securities,—and therefore, the new notes given upon the settlement and surrender of the said original securities, were, as to the sureties, without consideration; that the new notes are *usurious* on their

face, reserving ten per cent. interest; that if that reservation should not be held to be usurious, still it is prohibited by the banking law of this state, and so renders void the contract in which the reservation is made.

As to the subject of *usury* as involved in the objections thus stated, — there can be no need, at this day, of discussion as to the elements essential to constitute the fact of usury taken or reserved.

The law is explicitly and comprehensively stated as follows: "In construing usury laws, the uniform construction in England has been, (and it is equally applicable here,) that to constitute usury within the prohibition of the law, there must be an intention, knowingly to contract for, or to take usurious interest; for if neither party intend it, but act *bona fide* and innocently, the law will not infer a corrupt agreement. When, indeed, the contract, upon its very face, imports usury, as by an express reservation of more than legal interest, there is no room for presumption, for the intent is apparent. But when the contract on its face is for legal interest only, then it must be proved, that there was some corrupt agreement, or device, or shift to cover usury; and that it was in the full contemplation of the parties.     *      * The same principle would seem to apply to the prohibition in the charter of the bank. There must be an intent to take illegal interest, or, in the language of the law, a corrupt agreement to take it in violation of the charter." Story, J. in *Bank of U. S.* v. *Waggoner et al.*, 9 Pet. 399; *Andrews* v. *Pond*, 13 Pet. 76. WHIPPLE, Ch. J., in *Orr* v. *Lacey*, 2 Mich. 252, adopts in substance the language of Judge Story above quoted. The cases and text books present the subject with the same material features.

In the light of the law as thus announced, does the evidence tend to show the original transaction of loaning the thirty thousand dollars, to have embraced a usurious provision? The terms of the arrangement for that loan are not questioned. They are understood alike by all parties. It has resulted from the failure of Smith, Dwight & Co. to make the redemptions as agreed, that the bank, by way of interest on the redemptions made by it, in connection with the five per cent. to be paid on the principal sum, would be receiving more than six per cent. on

the original loan.   But we discover no evidence tending to show that such a result was contemplated by the parties in making the agreement under which the money was advanced by the plaintiff; while, on the other hand, the testimony is explicit, that such a result was not contemplated, and that the bank, by its officers, expected that Smith, Dwight & Co. would carry out the agreement as to redemptions ; in which event the bank would not have been able to realize more than six per cent. on the money loaned. Under this state of the evidence, we think it would hardly be warranted to hold that there was anything tending to show such a corrupt agreement as the law contemplates in order to constitute a usurious contract, such a one as would render void the securities upon which the loan was made.

But if it were to be assumed that in the original arrangement, in pursuance of which said note and drafts were given, usury was provided for, would that affect the validity of said securities, except as to the usury covered by them?   In considering this question the distinction is to be kept in mind between *usury* in its specific character, as affecting the validity of contracts, and the transcending of corporate authority by the bank in making contracts.

We confine our present remarks to the former of these subjects.   The law on the subject of interest, as established by the statute of 1836, has received a uniform practical construction throughout the State, both in and out of court, which construction has received judicial countenance, if not direct adjudication, in the supreme court.   It is, that a contract affected with usury is valid to every intent, except as to the usury reserved in or paid in pursuance of it.   Such is held to be the law by other courts under similar statutes ; *De Wolf* v. *Johnson,* 10 Wheat. 367 ; *Wycoff* v. *Longhead,* 2 Dall. 92 ; *Turner* v. *Calvert,* 12 Serg. and Rawle 46 ; *Fleckner* v. *Bank of U. S.,* 8 Wheat. 354.

In *Blandel* v. *Isaac,* 13 Md. 202, the question arose under a prohibition in the constitution, similar to that in our statute. Ch. J. LeGrand says: " the thing forbidden by the constitution is the taking or demanding a higher rate of interest than six per cent. ; it is not forbidden to take or demand that, or a

lesser rate.   The thing forbidden is the excess, and nothing else, and that is what is illegal and void."

So far as the vitiating effect of *usury* is concerned, we do not discover any reason for distinguishing between natural and artificial persons.   A bank, under the law giving it existence, is as distinct and actual an entity as a natural person, and, aside from the peculiar attributes and limitations which the law of its existence impresses upon it, it stands upon the same ground of right and liability as a natural person.   When, therefore, a rate of interest, beyond what is allowed by law, is to be held operative as *usury*, that is, as a corupt agreement in contravention of the provisions of the law on this subject, we do not perceive any principle or reason upon which it should be held to work consequences as to a corporation, as a bank, other and more serious than as to any natural person.   The view we entertain in this respect seems to be countenanced and sustained by what we have cited above from 9 Pet. and the other cases referred to, and to be fully sustained by cases that we shall have occasion to refer to in discussing another aspect of this case, and particularly by the case of *The Phila. Loan Co.* v. *Towner*, 13 Conn. 249.

Another point is urged in behalf of the defendant in reference to the consideration of the new notes, as depending on his liability on the original paper, viz : that, when he signed the original note and drafts, he supposed they were to be used in the ordinary course of discounts, and was not informed, and did not know to the contrary thereof, nor know of the arrangement under which they were to be used ; and, therefore, the fact that they were, under said arrangement, differently used, exonerated him from liability as surety on that paper ; and so, as to him, there was no existing consideration for the new notes.   We think, upon the evidence before us, that the defendant cannot stand upon this point.

It is conceded that Smith, Dwight & Co. were liable to the bank for the money unpaid on the original loan, however the securities given may have been invalidated by reason of usury or otherwise.   There is no suggestion that the defendant was misled or defrauded into signing said note and drafts by any rep-

Farmers' Bank *v.* Burchard.

resentation, or witholding of facts on the part of the bank.    There
is nothing in the evidence tending to show that the bank had any
agency in procuring him to become party  to that original paper,
or had any  knowledge of  the  means  by which he was procured
to become so.    For aught that appears, the Bank had a right to
suppose that those who  had  procured  the use of his name, had
done it upon truthful representations ;  and  particularly, that the
paper was  designed for  a longer run than an ordinary discount;
the face of the paper itself, by the provision of five per cent. per
annum,  bore such an indication as might reasonably lead the
bank to  suppose,  (if the  matter was in any way in mind,), that
the  defendant  had  knowledge  of  what was contemplated in that
respect.

It is beyond question that the bank advanced its money in reli-
ance upon the note and drafts, as the  direct security therefor,
and relying upon the supposed liability of the defendant on said
paper, and the defendant well understood this to be so.

In the absence of any fraud- towards the parties, it was com-
petent for the bank to hold and use that paper in any way it saw
fit, consistently with its legal character, and capability of use.
This has been so often decided, and so recently by this court, as
to render it improper to make words in discussing it.

In this connection we can  hardly forbear to remark, that,
among the facts and circumstances given in evidence, character-
izing the defendant's relation to the fact of said note and drafts
being designed to run beyond the ordinary course of discounts,
in addition to what we have already alluded to, the paper dated
Sept. 20th, 1853, and the one dated August 30th, 1854, signed
by him and the other parties to said note and drafts, show that
the defendant was, at those times, sufficiently aware of some
arrangement different from the common course of discounts.    It
is incredible that he regarded himself as having been misled
or. defrauded in this respect, in view of these papers, taken in
connection with the fact of his having signed the new notes in
the manner, and under the circumstances shown by the evidence,
without making any protest or claim predicated upon his having
signed said original note and drafts, under a misapprehension as
to the course that was to be taken with them.    In the absence

of any claim of fraud practiced upon him by the bank, whereby he was induced to sign said papers of Sept. 20th, 1853, and August 30th, 1854, he obviously stands in no posture to entitle him to countervail the legitimate import and effect of those papers, as evidence of the facts which they certify, by saying that he signed them without reading them and did not know their contents.

If, then, the character and validity of the consideration of the new notes were made to depend upon the defendant's liability upon the original note and drafts, as affected by the circumstances under which he claimed and offered to prove that he signed the original note and drafts, and the said papers of extension, we should feel compelled to hold against him; for, under the evidence given and offered, his right to defend against that liability could not rest upon the ground of his having been in fact misled or defrauded through the instrumentality of the plaintiff, but must rest solely on the grounds (if on any ground) furnished by the transaction itself, upon which it is claimed as matter of law, that the bank could not have enforced that original paper, because it had transcended its charter rights by an excessive loan, by demanding or receiving excessive interest, and by violating the principles of banking.

The views thus far presented readily indicate their proper application to several points that were made upon the evidence, both that which was admitted and that which was rejected, bearing upon the validity of the consideration of the new notes, as depending on the defendant's liability upon the original note and drafts.

In this connection it is proper to make a single remark upon the point taken, as to the deposition of Rogers, used in evidence to show notice of the protests of said original drafts. On the trial, the plaintiff was proceeding as well for a recovery upon the original note and drafts, as on the new notes, in view of the doubt that existed as to being able to recover on the new notes. In order to charge the defendant on those original drafts, it was necessary to prove due presentment and notice of dishonor. For this purpose that evidence was material and necessary. But the court having decided that the plaintiff was not entitled to recover

upon said original note and drafts, that evidence was thus rendered of no importance, unless it was necessary to establish the defendant's *absolute* liability on that note and those drafts in order to constitute and uphold the consideration for the new notes.

This we do not consider to have been necessary on the part of the plaintiff, as the case is before us ; for, as already remarked, the existing liability of Smith, Dwight & Co., for the money advanced by the plaintiff, would constitute a valid consideration for the new notes given to cover that liability. The defendant, having signed said new notes, if he would avoid his liability upon them, must either show that the consideration, as between the principal parties is void, or has failed, or that he was induced to sign the new notes through some fraud, with which the plaintiff was chargeable. .

What passed between Judge Rich and the defendant cannot be regarded as constituting such a fraud in any respect. The defendant, in view of what had transpired, of which a knowledge was in no way concealed or withheld by any shown fault on the part of the plaintiff, made no question as to his liability on the original note and drafts. He certainly knew whether or not he had received notice of their protest ; and, as depending on that, his judgment, as to whether he was liable or not, could not rest upon matter of fact, about which he could be mistaken, but upon mere matter of law, upon facts of which he could not be ignorant. Although he may indeed have been ignorant in this view, as to his liability, (of which we, however, see no evidence,) it would constitute a very feeble element in such fraud as would be requisite to avoid the liability assumed by signing said new notes.

It is not intimated that Judge Rich withheld or concealed any facts in his own knowledge, of which he supposed, or had reason to suppose, the defendant to be ignorant; and most certainly he could not assume to know better than the defendant whether or not he had been duly notified of the dishonor of said original bills, as matter of fact, nor how the defendant's liability was affected thereby, as matter of law.

It is not important and yet not improper to remark that, as it

seems to us, in what passed between the defendant and Judge Rich, as to the defendant's not becoming more liable than he already was, the parties had only in mind the amount due and unpaid on the original securities given upon the advance of the thirty thousand dollars, and not the various incidents attending the transaction and its history, by which the respective rights and liabilities of the parties might be affected.

How they would have been thus affected, in case the plaintiff had sought at that time to enforce those original securities by suit, would, to say the least, have given rise to questions of doubt, and perhaps of difficulty, if the defendant had made defence to the suit.

Upon very common principles, illustrated by a great number of cases, it was competent for the defendant to choose between contesting such questions, and yielding to his conceded liability, upon the terms proposed; and if he did thus yield, it is not permitted to him to repudiate the security given in that behalf, without showing affirmatively that he was made the victim of fraud, in thus closing with his adversary.

In connection with the point made by the defendant, that the bank had no right to hold the original paper as against him, for any other purpose than that of the ordinary and usual course of discount, it is claimed that the identical money advanced by the bank had been more than repaid, and therefore the defendant was no longer bound on that paper, and no act of the bank, in again remitting the money to Smith, Dwight & Co., could continue on foot the liability of the defendant. As to this, we see nothing in the case to warrant the claim. The funds furnished to the bank do not appear to have been designed or regarded as payments on the original loan, but as reimbursing redemptions made by the bank that Smith, Dwight & Co., under the arrangement, were bound to make. There was no illegality in providing for means of redemption, in itself considered, and whatever was done in fulfillment of that provision, so far as mere redemption is concerned, is unexceptionable, and money furnished for that specific purpose by Smith, Dwight & Co. may well have been, as all the evidence shows it was, applied between the parties accordingly. This stands widely distinguishable from general pay-

ments made on current transactions between the parties, without discriminating or indicating any specific application; to which the doctrine of *Kirby* v. *Duke of Marlboro'*, 2 M. & S. 18, and of *Pierce, Clark & Co.* v. *Knight*, 31 Vt. 701, would apply. As to those payments, under the arrangement providing for redemptions, so far as they have operated as receiving, by way of interest, more than the lawful rate prescribed by the charter and the banking laws of the State, we shall indicate our views in a subsequent part of the opinion. For present purposes it is sufficient to say that, in the light of the evidence, there is no ground for claiming that said payments operated to extinguish the liability of the parties on the original note and drafts.

Under the views thus expressed, regarding the defendant as not having successfully encountered the new notes, on the score of the consideration upon which they were given, as affected by the alleged usury involved in the original transaction, or as affected by the questions that have been raised touching the defendant's liability upon the original securities, in consequence of the supposed existence of which, he signed the new notes, we are brought to consider the rights of the plaintiff upon those new notes in reference to the questions raised in respect thereto in the argument.

These questions are made mainly upon the fact that said notes, upon the settlement, in the consummation of which they were taken, were made to embrace more than six per cent. interest upon the money loaned by the plaintiff to Smith, Dwight & Co., and upon the fact that they, in express terms, provide for interest on the principal at the rate of ten per cent.

So far as these facts present the subject of *usury*, in its legitimate character and consequences, we have, in discussing the subject in its relation to the original securities, said substantially all that the occasion requires.

As preliminary to the consideration of these facts in another aspect, it is proper to remark that we discover no evidence that said excess above six per cent., which was reckoned into said settlement, and is embraced in the principal of said new notes, was provided for by any corrupt agreement in violation or evasion of the law in 'such way as to constitute the fact of usury;

nor do we see any evidence showing that it was included in said settlement and notes with any such corrupt understanding or intent, as to subject it to the charge of being *usury*. The charges in the account in that respect accrued upon redemptions made by the plaintiff which Smith, Dwight & Co. had agreed to make but had failed to do so, which agreement is clearly shown by the evidence, without contradiction, not to have been tainted with any usurious intent. Having thus accrued it is not to be assumed as a presumption which the law demands, in the absence of evidence to that effect, that the intent was corrupt with which those charges were brought into that settlement. It is a common and familiar principle that every fact, in virtue of which a forfeiture or penalty is claimed, is not to be presumed, but must be proved to have the vicious character that is necessary, in order to render it effective of the result claimed for it.

As to the ten per cent. reserved in the notes, that rate transcends the limit prescribed by the charter and the banking laws of this State, but not what is lawful under the laws of the State of Michigan, where the notes were made payable, and where they were executed by some of the parties thereto, though not by the defendant.

Independently of the restrictions in the charter of the plaintiff's bank and in the banking laws of this State, it is beyond controversy that the notes could not be regarded as stipulating for unlawful interest. In this connection we repeat in substance what we have before said, that, so far as unauthorized rates of interest are affected with the taint of usury, they have the same character and work the same consquences, when reserved or received by banks, as when reserved or received by natural persons. In neither case, do the statutes declare the contracts void, nor provide a penalty or forfeiture. They are held to be inoperative for the unlawful excess of interest. If the laws on this subject are to have a different and more stringent operation in the case of banks than in the case of natural persons, it is not by reason of express provision to that effect, but in consequence of the intervention and operation of another class of principles and considerations, predicable upon the fact that banks are creatures of the statute, existing and having powers and rights only by virtue of

the provisions of the statute, and the fact that the statute prohibits banks from demanding or receiving more than six per cent.

We understand it to be claimed for the defendant, that, inasmuch as these notes were made payable in Michigan, they are void by force of the law of that State, as pronounced in *Orr* v. *Lacey*, 2 Doug. 252, on account of their providing for a rate of interest that is unauthorized by the charter of the bank and the banking laws of this State, irrespective of what might be the law of the subject in that State,—in other words, that Michigan is to be regarded as the *locus contractus*, and the contract is to be administered according to the law of that State.

We defer the discussion of this point, until we shall have considered the subject independently of the doctrines as to the *lex loci contractus* which are claimed to apply, on the score that these notes are to be regarded as falling under the operation of, and to be governed by the law as it is held in the State of Michigan.

The proposition is, that by force of the prohibition in the charter and the banking laws of this State, the fact that the notes embrace in the principal sum interest beyond the prescribed limit, and also reserve on their face interest exceeding that limit, render said notes void as contracts *in toto*.

Without undertaking to reconcile all the conflicting decisions, we think there is an important distinction to be made between cases in which there has been a mere transcending of the limits of a conferred right, on the one hand, and cases, on the other, in which there is an entire prohibition of right, whether accompanied or not by a provision of a penalty for violating such prohibition, or a provision that the prohibited contract or act shall be void.

It seems to me that if this distinction be kept in view, many of the cases, that at first appear to be in conflict with each other, will prove to be consistent. Where such an entire prohibition in the organic act exists, the legitimate consequences are obvious upon sound principle. But where there is a mere limitation of the extent to which a conferred right may be exercised, the reason is not very apparent why the exceeding of that limit should operate to any other intent than to render such excess void and ineffectual. With the exception of the cases cited from the

States of Ohio and Michigan, it seems to us that the general current of the decided cases is not unfavorable to this view. Assuming, as we do, what has become a trite maxim of the law, that a corporation has no rights, powers or authority except what are expressly conferred, or necessarily implied in order that the express may be available, it is clear, and so are the cases, that the corporation cannot do a valid thing by way of contract or otherwise outside of what is thus conferred or implied.

Hence it has been held that where the organic act provides only for taking certain kinds of securities in the business of the corporation, as bonds and mortgages, such corporation has no power to take and enforce a different kind of securities ; or where it provides that the corporation may loan money, but not discount notes, it cannot enforce notes taken upon discount. Some such cases have been cited. But in the present case, the bank was authorized to loan its money, and take securities in the form of notes or otherwise therefor, and to demand and receive for the use of such money six per cent. banking interest, and no more. Now it is difficult to understand and appreciate the principle, either in law or reason, upon which a note thus taken should be held inoperative, except for any excess above the limited rate of interest that may be included or reserved in it, in the absence of any provision that such note should be void, or for a penalty or forfeiture, for the taking of a note with such excess of interest included or reserved. No moral vice inheres and taints a note so taken, but it clearly would lack the warrant of law as to such excess of interest, and of course to that extent would be inoperative and void. As to such excess, it would seem to stand upon the same principle as, and in strict analogy to, the cases in which the law had prescribed a specific kind of securities, but a different kind had been taken,—the courts holding that the corporation had no power to take such security, and putting the cases expressly on the want of power, that went to the very foundation of the right to enforce such unauthorized security.

The following cases cited by the defendant's counsel seem to have been decided upon the ground that the corporation had engaged in a kind of business not authorized by its charter, as

banking when only insurance was provided for; or had taken a
kind of security different from that specifically prescribed ; or had
undertaken to contract wholly *ultra vires*, in distinction from
having transcended the limit of its right in reference to a trans-
action to which it was lawfully authorized ; none of which cases
involve the subject of a contract in which an excess of interest is
included or reserved for money loaned, when such loan was author-
ized at a prescribed rate, and neither a penalty nor an avoid-
ance of the contract was provided by the law itself in case of
such excess.

*Firemen's Ins. Co.* v. *Ely*, 5 Conn. 560 ; *Beach et al.* v. *Fulton
Bank*, 3 Wend. 573 ; *Bartlett* v. *Atheneum Life Ass. Society*,
37 E. L. & E. 187 ; *East Anglian R. Co.* v. *Eastern Counties R.
Co.*, 7 Ib. 505 ; *Springfield Bank* v. *Merrick et al.*, 14 Mass. 322 ;
*Swift* v. *Beers*, 3 Denio 70 ; *Leavitt* v. *Palmer*, 3 Coms. 19 ;
*Bank Com'rs.* v. *St. Lawrence Bank*, 3 Seld. 513 ; *N. Y. Fire
Ins. Co.* v. *Sturgess*, 2 Cow. 664 ; *Life Ins. Co.* v. *Davis*, 2
Kern. 569 ; *Talmage* v. *Pell et al.*, 3 Seld. 328.   On the other
hand, there are cases, such as *Little* v. *O'Brien*, 9 Mass. 422,
which hold that a violation of the organic act of incorporation,
by the making of an unauthorized contract, is not available as a
defence to the party promising in such contract ; but only to the
public, by some proper proceeding for abrogating the franchise.

The case of *The Philadelphia Loan Co.* v. *Towner*, 13 Conn.
249, illustrates, and seems to be an authority for the views we
have now presented.

While it was held that the note in question was not void as a
contract, under the laws of Pennsylvania, on account of the res-
ervation of excessive interest, still it was held to be void, for the
reason that it was taken by way of *discount* in the commercial
sense, the act of incorporation providing " that nothing in the
act contained should be construed to authorize said company to
discount notes." And yet it was also held that, so far as the trans-
action was a *loan* of money, the company was entitled to recover
the money loaned under the common counts, inasmuch as the
company was authorized to *loan* money, though not to *discount*
notes ; and inasmuch as the discounting of the note in suit was
not a part of the original transaction of loaning the money, but

was subsequent to it, and by way of renewal of the security for
the original loan.

In the case of *Quinsigamond Bank* v. *Hobbs*, more recently
decided in the supreme court of Massachusetts, of which there is
a note in the Law Reporter, for January, 1859, it was held that
" taking more than six per cent. interest by a bank in the dis-
count of a note, does not prevent the bank from maintaining an
action on the note, notwithstanding the provisions of the statutes
prohibiting the taking of more than six per cent. by banks in such
cases, under a penalty of five hundred dollars for each offence."

In *Vansands* v. *Middlesex Co. Bank*, 26 Conn. 144, the validity
of the defendant's lien on certain shares of the stock for the
indebtedness of the owner of the stock, was the subject of con-
troversy.    One ground taken by counsel was, that the discount
upon which the indebtedness was created was illegal, as being
made in violation of the statute prohibiting the bank from mak-
ing a loan or discount on pledge of stock.    The case was decided
on the ground that the lien claimed was not in virtue of a pledg-
ing of the stock within the meaning of the statute.    Yet STORRS
Ch. J., in deliving the opinion of the court, gives attention to the
point taken by counsel, and holds the following language: " The
directors of banks, whose exclusive business it is to make loans
and discounts, and perhaps the banks of which they are the agents,
might be amenable to the courts for a violation of this law, if
they should disregard its prohibition, as they clearly would be to
the legislature ; but there would seem to be no sufficient reason
why the loan or pledge should be pronounced void.    Especially
is it questionable whether it can be treated as invalid in the
absence of any provision in the act declaring that the loan or
pledge shall be void, or imposing any punishment for its viola-
tion."    We refer to this case and cite this language, as indicat-
ing the tendency of courts, and leading jurists towards the doc-
trine, which we regard the true and sound doctrine of the subject.

We do not understand the decision of the court, or the reason-
ing of Judge STORY, in delivering the opinion in *Bank of U. S.*
v. *Waggoner et al.*, 9 Pet. 399, to be inconsistent with this view.
That case arose under the laws of Kentucky, which declare all
bonds, contracts, etc., utterly void, on which a greater rate of

interest was reserved or taken than was allowed by law; and the whole reasoning of the court was with reference to contracts affected by such statutory laws. Judge STORY refers to the case of *Fleckner* v. *U. S. Bank*, 8 Wheat. 338, in which he also delivered the opinion, and says that that decision was deliberately adhered to. In the case last named, he used the following language: "The taking of interest by the bank beyond the sum authorized by the charter, would doubtless be a violation of its charter, for which a remedy might be applied by the government; but as the act of Congress does not declare that it shall avoid the contract, it is not perceived how the original defendant could avail himself of this ground to defeat a recovery." The case of *Blandel* v. *Isaac*, 13 Maryland, 202, called for than elaborate discussion of this subject by Ch. J. LEGRAND, in the court of appeals, in which the cases are elaborately reviewed; and particularly the case of *Dill* v. *Ellicott*, in the circuit court of the district of Maryland, in which the contrary doctrine was held by Judge TANEY, is thoroughly criticised. So far as the case of *Blandel* v. *Isaac* presents points of analogy with the one before us, for the application of the law, the court of appeals takes the same view of the law, and makes a similar application of it as we do in this case. In *Planters' Bank* v. *Sharp*, 4 Sm. & Mar. 75, as shown by the note of the case in 5 U. S. Dig. 904, sec. 22, it was held that " when a bank, in its discounts, reserves a greater interest than is allowed by its charter, the contract in Mississippi falls within the general law of usury; but it is not void, and the bank may recover the principal sum lent, though without any interest."

From the best consideration we have been able to give to the subject, with the aid of the learned counsel in argument, and the light thrown by the various cases and books cited, we think the sound legal reason of the subject requires us to hold, that the transcending by the bank, of the rate of interest prescribed by the laws of this State, whether treated as a violation of its charter, and the laws governing its existence and acts, or as *ultra vires*, as the term is technically used, should have no other effect upon the contract than to render it void and inoperative as to such excess only; and that in this respect, the law stands upon the

same ground of principle, and should be administered only to the same intent, in its effect upon contracts, as the general law of the State regulating the subject of interest for the use of money. And in this result we think we find so considerable a force of precedent and authority, as to preclude us, at least, from claiming the merit, as well as free us from the charge of novelty and singularity.

This view of the law of this aspect of the case applies to, and disposes of, the point taken on the same ground in reference to the validity of the original note and drafts, as affecting the character of the consideration for the new notes ; for it is unquestioned, that, if the original note and drafts, on which the defendant was party, were void on account of the illegality of the transaction out of which they grew, or of which they constituted a part, and the new notes grew out of the illegal contract first entered into,—in other words, were not a new contract upon a new consideration, the new notes would be affected with the same legal infirmity as the original paper.

As to the point that the original loaning of thirty thousand dollars, by creating a debt of more than ten per cent. of the capital stock actually paid in, was a violation of the law on that subject. and this defendant may take advantage of such violation in defence to his liability in this case ; it is obvious that substantially the same principle is involved as in the point already considered, as to the receiving or reserving excessive interest. In the one case it is insisted that, by reason of providing for the receipt of a larger rate for the use of the money loaned than the law allows, the plaintiff is not entitled to recover. In the other it is insisted that, by reason of having loaned a larger amount than the law allows, the plaintiff is not enitled to recover.

Having said all that is deemed necessary on the subject of excessive interest, it seems proper to add a few words as to this other specific ground of defence. It is not questioned that no defence is open to the surety, based upon the illegality of the consideration, that is not equally open to the principal. Unless the principal could defend these notes on the ground assumed, the surety canno⁴ do it on the same ground. It is claimed, indeed, that said notes are void as contracts, and so could not be enforced

Farmers' Bank v. Burchard.

against any of the parties to them. But it was not questioned, indeed it was conceded, that the bank might, under the common counts, recover of Smith, Dwight & Co., the money actually advanced to them with lawful interest. It would be difficult, we imagine, to assign a reason why the bank could thus recover, and at the same time assign a reason, either cogent or plausible, why it should not recover on a special count on the notes themselves. The assumption is, that the loan being illegal, the contract or promise to repay the money is void. But would not such illegality work equally to vitiate the right of recovery upon an *implied*, as upon an express promise? It would seem to present a strange incongruity, if the law would refuse in a given case to recognize the validity of an express promise, and in the same case, and upon the same transaction, would imply and enforce a contract of the same force and effect. If then it is to be held, as we think it should be, that the principals, Smith, Dwight & Co. were liable for the money loaned to them, and that such liability might be enforced by an action of assumpsit counting on the implied promise to pay, in our opinion it might as well be enforced upon a security, as a note, covering that liability, and expressly promising to pay. It would follow of course that a surety upon such note would be bound to the same extent as such principal, so far as depended on the validity and sufficiency of the consideration. Upon the specific subject of the effect of such a transcending of authority or violation of the statute as occurred in this case, the more recent cases seem to be harmonious in settling the law. The result is well stated by SEDG-WICK in his work on constitutional and statutory law, 90, as follows: "It must further be borne in mind, that the invalidity of contracts made in violation of statutes, is subject to the equitable exception, that although a corporation in making a contract, act in disagreement with its charter, where it is a simple question of capacity to contract, arising either on a question of regularity of organization, or of power conferred by the charter, a party who has had the benefit of the agreement cannot be permitted, in an action founded on it, to question its validity. It would be in the highest degree inequitable and unjust to permit the defendant to repudiate a contract the fruits of which he retains. And the

principle of the exception has been extended to other cases. So a person who borrowed money of a savings' institution upon his promissory note secured by a pledge of bank stock is not entitled to an injunction to prevent the prosecution of the note, upon the ground that the savings bank was prohibited by its charter from making loans of that description." See also the case of *The Steam Navigation Co.* v. *Weed et al.*, 17 Barb. 378, in which PARKER, J., brings together the leading cases in this country on the subject, and closes with noticeable zeal, saying, "I am happy to come to the conclusion that the law will not permit this most unconscionable defence. It ill becomes the defendants to borrow from the plaintiff one thousand dollars for a single day, to relieve their immediate necessities, and then turn round and say, 'I will not return you this money, because you had no power, by your charter, to lend it.' Let them first restore the money, and then it will be time enough for them to discuss with the sovereign power of the State of Connecticut the extent of the plaintiff's chartered privileges. We shall lose our respect for the law, when it so far loses its character for justice as to sanction the defence here attempted. ' *Lex plus laudatur, quando ratione probatur.*' "

It is not claimed in the present case that the violation of the prohibition in the banking laws as to the amount of indebtedness derives any additional force in vitiating a contract, on account of the provision in sec. 79, for the punishment of the director or other officer, who shall misbehave in this respect, nor of the provision in sec. 56, for civil remedy against directors, through whose misbehavior the stockholders or creditors of the bank may have suffered loss. Nor could it well be so claimed; for these provisions seem to be based upon a distinction taken between the corporation as an existing body, and the officers who are entrusted with the management of its business transactions ; and they proceed upon the idea, that while such officers may be guilty of misbehavior and worthy of penalty, the corporation itself as an aggregation of stockholders, duly organized, may not only be innocent of any fault, but may even be the victim of the faulty conduct of the officers.

If the offending person was the corporation, it would not be difficult upon principles both of law and justice to leave him sub-

ject to all the implied consequences of his disregard and violation of the statute. But when he is merely a representative trustee, and his misconduct is his personal fault, in violation of his duty both to the law and the corporation, it is by no means clear that the corporation, or its other individual members should be subjected to damaging consequences to be implied, and not expressly provided.

It was undoubtedly in this view that the point was put simply on the ground that the act of loaning an excessive amount was contrary to the provision of the statute limiting the amount of allowable indebtedness, irrespective of any penalty provided for so doing. This excludes the idea that the act is to be regarded in the nature of a crime on the part of the corporation, either moral or statutory, or as contributing to, or aiding an act of that kind. The law, as declared and applied in the case of *Terrett et al.* v. *Bartlett*, 21 Vt. 184, is quite familiar. It has been wisely settled and well applied through a long course of judicial administration. But this case does not fall within that category. It is obvious to us that these provisions of limitation and prohibition, so far a.. the corporation as an existing body is concerned, affect only the question of capacity and authority; and therefore, whether the transcending of the limits in the amount to which a loan is authorized to be made, shall operate to avoid the contract for repayment, either express or implied, or preclude the right of recovery, is to be determined as a question of intent upon the statute itself. If such intent be manifest the consequent result will be realized. If not manifest such result will not occur. In *Harris* v. *Runnels*, 12 How. (U. S.,) 79, it is said " that whatever may be the structure of the statute in regard to the prohibition and penalty, or penalty alone, it is not to be taken for granted that the legislature meant that contracts in contravention of it are void in the sense that they are not to be enforced in a court of justice; that the statute must be examined as a whole, to find out whether or not the makers meant that a contract in contravention of it was to be void, so as not to be enforced in a court of justice." If this is true in relation to a statutory prohibition, the violation of which is followed by a penalty upon the party violating it, it would seem

not only to be allowable in a case standing simply upon a pro-hibtion, without penalty upon the party sought to be charged with the invalidity of the contract, but to require the intent to be clearly manifested in order to warrant the court in holding the contract void, and thus virtually working a forfeiture of the money loaned.

Not only does the statute not provide a penalty upon the bank, nor declare such a contract, either express or implied, to be void (which of itself would seem sufficient to preclude any ground for implying an avoidance) but in providing for a penalty upon the offending officers, and for a civil remedy both upon their official bond and also personally, in favor of parties, stockholders as well as creditors, who should suffer damage by their misconduct in the particular in question, it seems to carry the direct impli-cation that such contract is not to be regarded as void. There is nothing in the statutes on the subject of banks and banking that looks in a contrary direction, either in respect to an excessive loan, or the taking or demanding interest beyond the prescribed rate.

Upon this point then, standing upon the mere fact of having violated the statute by exceeding the authorized limit of the amount of indebtedness, the authorities cited and referred to must be regarded as conclusive, being as we conceive well grounded in principle.

Smith, Dwight & Co. could not avail themselves of this ground of defence against the notes ; nor, as before said, can the defend-ant as their surety, so far as the money loaned constituted the consideration either of the original paper or the new notes. In this connection it may be further remarked, that the defendant was cognizant of the amount thus loaned ; and its unlawfulness was a matter depending upon a public statute. He had full knowledge of the character of the transaction in this respect from the outset. It being conceded that Smith, Dwight & Co. were liable to the plaintiffs for the money thus loaned, it is clear that when the defendant became their surety for the same by signing the new notes, with such full knowledge, he assumed a liability to the plaintiffs, so far as the consideration is concerned, co-exten-sive with that of Smith, Dwight & Co. ; so that, as depending on

the fact that the prohibition of the law was violated by making a loan to that amount, the defendant is not in a posture to take advantage of it in his own discharge from liability.

We are now prepared to recur to, and consider the point of defence, that the law of the State of Michigan is to govern, as the *lex loci contractus*, and that, under that law, the new notes are wholly void.

As already announced, we hold the law in this State to be, that the reservation or providing for a higher rate of interest than the law allows, affects the contract only in reference to the unlawful or unauthorized excess; so that, if governed by the law as held here, the notes would, at any rate, be valid as contracts for the money loaned and advanced by the plaintiff, with the lawful interest. Under the laws of Michigan the same would be true, if the plaintiff was a *natural* instead of an artificial person; and the same must be true, notwithstanding the plaintiff is an artificial person, unless the laws of Michigan are to visit consequences upon acts of the bank that are beyond its authority to do, which are not visited by the laws of the State in which the bank was created, and by whose laws it is clothed with corporate powers, and limited by restrictions and prohibitions.

The operation claimed in this case for the laws of Michigan is not based on the ground that the taking or reserving of usury by the bank is any violation of the statutes of that State, that would render the contract void. But it is on the ground, that on common law principles, as held in that State, and evidenced by the case of *Orr* v. *Lacey*, a contract by a corporation transcending in this respect its power to make, is void *in toto;* so that, assuming that the bank, under the laws of this State, had no authority to demand or receive interest beyond the rate of six per cent., inasmuch as in the notes in question more than that rate of interest is embraced and provided for, the notes are entirely void as contracts. In other words, by applying Michigan common law to a Vermont statute, a contract is made void that, under the law of Vermont alone, is valid to a certain extent, and under the law of Michigan alone, is valid to an equal extent at least.

We think this presents a new and extreme example of the

comity between States, in virtue of which the *lex loci contractus* is allowed to govern the validity, construction and operation of contracts; and none the less new and extreme, in view of the fact that both parties to the contract now in suit were, and ever have been located in this State, and are before the constituted tribunals of this State to have their respective rights and liabilities determined.

If the bank was a Michigan institution under the same statutory provisions as exist in this State, or if the rate. of interest reserved was in violation of any statute of Michigan, either in respect to interest generally, or as to the extent to which corporations have the right to take or contract for interest, it would not be difficult to assent that such statutory provisions should have the full effect which the common law principles of that State would legitimately give to them, in their application to these notes. But when neither of these conditions exist, it is difficult for us to see upon what reason of principle, comity, or morality, we are to accomplish the result asked, by assuming as the law of Michigan what is claimed for the case of *Orr* v. *Lacey*, and engrafting it upon a statutory disability in the plaintiff in this State, and thus working a forfeiture which the laws of neither State *proprio vigore* would work.

We have found no case that, upon its facts, involves such an application of the doctrine of *lex loci contractus*. The cases, so far as we have examined them, are either those in which the contract was declared void by the laws of the State, in virtue of which the corporation had its existence; or was, as a contract, contrary to the law or the policy of the State in which the contract was made; which cases stand on a wide distinction from this case, in which the contract is unimpeachable in Michigan, so far as its provisions are related to the statutes or the policy of that State on the subject of interest, and. unimpeachable in this State, except for the excess of interest above the prescribed rate.

The true view seems to us to be, that the capacity of the party, and the validity of its acts, as affected by that capacity, are to be determined by the law which gives it existence, and confers and limits that capacity, and that, in Michigan, the acts of such party would be held valid to the same extent there as in this

State, unless there is some law or policy of that State that would thereby be contravened or prejudiced.

In *Bard* v. *Poole*, 2 Kernan 495, DENIO, J., holds the following language : " They (corporations) are beings existing only in contemplation of law. and have no other attributes than such as the law confers upon them ; and as the laws of a country have in general no extra-territorial operation, a corporation cannot challenge, as a matter of right, the privilege of dealing in a country not under the jurisdiction of the sovereignty which created it. Any of the States of the Union may, as this and several other States have done, interdict foreign corporations from performing certain single acts, or conducting a particular description of business within its jurisdiction. But in the absence of laws of that character, or in regard to transactions not within the purview of any prohibitory law, and not inconsistent with the policy of the State as indicated by the general scope of its laws or institutions, corporations are permitted by the comity of nations to make contracts and transact business in other States than those by virtue of whose laws they were created, and to enforce those contracts, if need be, in the courts of such other States. It is of course implied that the contract must be one which the foreign corporation is permitted by its charter to make ; and it must also be one which would be valid if made at the same place by a natural person, not a resident of that State ;" citing several authorities, and particularly *Bank of Augusta* v. *Earle*, 13 Pet. 519, which see.

We have thus far discussed this topic upon the ground that the new notes are to be regarded as contracts made in Michigan, and that the law of that State is as the defendant's counsel claimed it to be, upon the evidence of the case of *Orr* v. *Lacey*. As to the place of the contract, whether Vermont or Michigan, we are not disposed to make any question as against the claim of the defendant in this respect ; though, if the point were subjected to a close scrutiny upon principle and authority, applicable to the evidence in the case, it might perhaps be difficult successfully to maintain what is claimed in this respect.

But as to the case of *Orr* v. *Lacey*, as it is proved and introduced into the case as evidence of the law of Michigan, it is

worth while to give it a moment's notice, both in its character as evidence, and as an authority cited in usual course. In that case the real plaintiff was a bank in Indiana, and the legal rights of the plaintiff were discussed and adjudicated the same as if that bank had been the nominal as well as the real plaintiff. The question arose upon the discount of a draft by said bank at its branch in Michigan, in which it was claimed that, by reason of having advanced upon said discount depreciated bills, at the same time reserving the lawful interest, usury had intervened in the transaction.

It was proved that, by the laws of Indiana, usury thus reserved would render the contract void. By the laws of Michigan as then existing, the effect of the usury would be, not to render the contract void, but to subject the plaintiff to the deduction of three times the excessive interest. The supreme court approved the charge of the court below in holding that the contract was to be governed by the law of Michigan, notwithstanding the draft was made payable in the city of New York, saying: "The instruction thus given to the jury was founded on the opinion that the contract was governed by the laws of this State, and not by the laws of New York or Indiana, which rendered void all contracts infected with usury. It is to be observed that the real plaintiff in this cause is a corporation created by a law of the State of Indiana. The capacity of this corporation to make a contract therefore must be tested by that law."

After disposing of this branch of the case, the court then proceed to consider another, in which the law is propounded, upon which the defendant relies, and which the learned judge introduces thus: "Supposing however that the jury should find that the facts warrant the presumption that the payment by the bank to O. P. Lacey of depreciated bank notes was a device by which to obtain a greater rate of interest than is allowed by law; it then becomes important to determine whether the contract is absolutely void, or whether, according to our laws, the plaintiff only forfeits three times the usurious interest." It is upon this substratum that the whole discussion proceeds, viz: that of a device by which to obtain a greater rate of interest than is allowed by law — in which the judge states the legal propositions which are claime l

to be the law of Michigan, viz: "that a corporation possesses only those powers expressly given by its charter. Among those granted to the Indiana State Bank is a power to discount bills and loan money, reserving upon such loan six per cent. per annum, and no more. There is no provision in the charter which declares that a contract reserving more than six per cent. shall be void. No principle however, is at this day better settled, than that a court will never carry into effect a contract made in violation of a positive law, any more than they would a contract founded on an immoral consideration. If therefore there was an incapacity on the part of the bank to make the contract declared upon, or if the contract was made in violation of its charter, a court of justice will not lend its aid to carry it into execution." After discussing the application of these propositions to the subject in hand, the learned judge closes thus: " As the courts of Indiana, if a suit had been there instituted on the bill declared upon, would have pronounced it void, as having been inseparably connected with the contract out of which it grew, so the courts of this State will examine into the capacity of the bank to make a contract, and if it discovers a want of capacity to make one on which a recovery is sought, they will not carry it into effect." All of which results in this, as the only point presented for decision or decided : that when a plaintiff corporation, existing under the laws of Indiana, comes into the courts of Michigan, to enforce a contract, which, under the laws of Indiana, would be held void by the courts of that State, by reason of its covering a device by which to obtain a greater rate of interest than it is allowed by law to take, the courts of Michigan will also hold it void, notwithstanding it would not be void by the laws of Michigan, if made by a natural person.

The marginal note of the case is quite significant of what was understood to be the case decided, whether that note was made by Judge WHIPPLE, who delivered the opinion of the court, or by Judge DOUGLASS, the reporter. After the brief statement of three abstract propositions that were assumed in the opinion, (with which no one would find fault, as abstract propositions, whatever may be thought of the application they have sometimes received,) it proceeds: " If, therefore, a bank, on discounting a

bill of exchange corruptly reserves a greater rate of interest than it is authorized by its charter to receive, the bill will be void. And so will be a new bill given in renewal of the balance due on such previous illegal one."

Now it is well understood that a decision is authoritative in respect to principles only in virtue of the application of those principles to the particular case, and is evidence only of the state of the law in that application of it. Without criticising the application there made, or even intimating that we should not make a similar application, and arrive at the same result in a like case, it is sufficient to say that the present case is destitute of elements that were assumed as material in the decision of that. In this there is no evidence tending to show any corrupt agreement for usury, or any device by which to obtain a greater rate of interest than is allowed by law. In this case the contract is not held to be void in this State, where and by whose laws the bank derives its existence, while in that case it was assumed by the learned judge that the draft in question would be held to be void by the courts of Indiana.

In another aspect, that case would seem to lend some countenance to other views that we have expressed, and particularly as to the law by which the capacity of a corporation is governed and fixed, and the consequences resulting therefrom, as affecting contracts made by it.

If however we err in our views of that case as now developed, we are quite confident that case does not show a state of the law in Michigan, which would engraft an abstract common law proposition as there held, upon a statute of this State, and thereby work an avoidance of a contract that is valid by the laws of this State to the extent claimed for it, and is not in contravention of any positive or statutory law, or the policy of that State.

It was claimed in the argument that the ten per cent. being provided for on the face of the notes, was conclusive of the intent to take usury, and so not open to question. That might be so perhaps, if the bank had been the immediate party to whom the notes were made payable and to whom delivered by the makers. But in this case the notes were made payable to C. P. Austin, or order, under circumstances that rendered it uncertain whether

the bank would receive them or not. As payable to him they import no usury. When it is sought to charge the bank with their effect as usurious, resort of course is had to the circumstances under which and the manner in which the bank became the holders thereof. In showing this, it was clearly competent and proper to show all that gave character to the transaction, and precisely the terms and understanding on which the interest and rights of the bank accrued therein. Upon the facts shown, these notes did not become effective, as notes, till received by the bank; for it was part of the arrangement for the projected settlement, that unless they should be received by the bank, they were to be returned to the principal makers in Michigan. It is not controverted that the officers of the bank, in their action upon the subject of receiving said notes, in view of the question whether the bank would be entitled to hold them as valid for the rate of interest specified, determined to receive them to be operative as to interest only for such rate as it might be authorized to receive. As the law fixes expressly that rate to be six per cent., it would seem that, as against the forfeiture claimed, it should be held that, virtually, it was at that rate of interest that the notes were received for. We see nothing in the evidence to contravene this view, nor are we aware of any principle of law that should lead us to a different result. It can hardly be claimed that the bank should have sent the notes back, to be substituted by a new set, providing for only six per cent. interest, when, without claiming or determining to receive them for more than the law would allow, it was impossible, under the law, that they should receive more. The makers, under this condition of things, were in no more danger of an unlawful exaction than they would have been if the notes had specified the rate of interest at six per cent., or had been silent as to the rate, and left it for the law to fix. If this view be correct, then as a matter of course, the point made in virtue of the law of Michigan as claimed to be shown by the case of *Orr* v. *Lacey* has no ground to rest upon, so far as the provision for interest on the face of the note is concerned.

While we hold that, if the notes in question had been taken and were held by a natural person instead of the bank, the

reservation of ten per cent. interest would not render them obnoxious to the charge of usury, still we think, as the bank is expressly restricted, by its charter and the general statutes on the subject of banking, from demanding or receiving more than six per cent. banking interest, it is bound by that restriction. These notes were taken for the unpaid balance of the money originally loaned, and in lieu of the original note and drafts. So far as that money is concerned we regard the bank as having no right under the law to take, as interest, more than six per cent., according to the usages of banking. In this respect the bank stands on different ground from a natural person. It has no power and no rights, only as they are expressly conferred or necessarily implied. The policy and purposes for which such corporations exist would seem to be contravened by permitting the bank to transcend the limit prescribed by the law in this respect. The primary object of creating such institutions and endowing them with their franchise privileges. is to serve the interests of the community in which they are located, by furnishing a currency for the convenient and safe transaction of business; and as a consideration for this service, the corporate rights and privileges are conferred.

It seems clear to us that if a bank was to be permitted to demand and receive a larger rate of interest than six per cent. in virtue of having loaned its money, or taken security therefor, in another State, where a higher rate is allowed by law, it would constitute an effective inducement to send its money into foreign service for the benefit of the stockholders, instead of holding it subject to the needs and for the service of home convenience, a direct temptation to disregard and thwart the very purpose and consideration for which the State has given it its existence and peculiar privileges.

In this connection another consideration presses strongly on our attention, and that is the peril in which our banks put themselves, and the disasters which have befallen some of them, by withholding their money from domestic use, and sending it abroad upon adventures, in pursuit of large profits ; thus not only doing injustice to our own citizens, who need warrantable accommodations in the prosecution of their customary business, but jeop-

ardizing the interests and rights of the stockholders themselves, and creating distrust, and confusion, and discredit in the common currency of the country. The present case furnishes an impressive illustration both of such peril and disaster, and presents in a clear light the importance of giving no countenance to such a course on the part of banks, by allowing them to reap advantage in respect to rates of interest upon loans exceeding the limit prescribed by our own statute laws.

While, therefore, we hold that the notes on which the judgment is based are not void by reason of the reservation of ten per cent. interest on their face; still, at the same time, we hold that they cannot be enforced for a greater rate than our own law prescribes.

The views last presented properly apply to the subject of interest on the original loan, that may have been reckoned in, and become part of the principal sum for which the new notes were given.

In the first place the bank had no lawful right to contract for or to receive more than six per cent., according to the usages of banking. In the next place, the contract into which the defendant entered, by becoming party to the original note and drafts, was for interest at five per cent. per annum. It was only in settlement of his liability thus measured, that he became party to the new notes. Of the arrangement and course of business, out of which sprung the charges of interest on the redemptions, or that such charges existed or were embraced in that settlement, and entered into the principal sum of said new notes, he had no knowledge. At the time he agreed to sign, as well as at the time he did in fact sign the new notes, he supposed they covered only the amount he was liable for in consequence of being surety on the original paper. And the evidence shows that in what passed between the defendant and Judge Rich, it was understood by both that the defendant was not, by signing the new notes, to make himself liable for more than he was already liable for by reason of his name being upon the original note and drafts. This was on the occasion of the defendant's agreeing to sign notes that might be taken on settlement of the old paper,

and before C. P. Austin went west to make the settlement, in case he could not get the pay.

It does not appear that Judge Rich, at that time, had any knowledge or forecast as to the details of the contemplated settlement, or to what extent the indebtedness of Smith, Dwight & Co. to the bank would remain unpaid, and therefore would be embraced in new notes that might be taken, or that he made any representations to the defendant in that respect.

It stood between them, on that occasion, upon the mutual understanding that the defendant's liability on new notes, that he agreed to sign, was not to exceed his existing liability on the original paper. It does not appear that anything further passed between the parties, except that the new notes, when presented, were to be signed by the defendant.

While, therefore, we find no evidence of a fraud practiced on the defendant in the means used to procure him to sign the new notes, still we are clear that he signed them under the warrantable belief that they covered only his liability on the original paper; and we think that only to that extent should he be held liable on the new notes. That liability would be measured by determining how much there was due upon that original paper at the time the new notes were given, the same as if a judgment were to have been made up on that paper at that time, which of course would embrace interest only at the rate of five per cent. per annum. This of course excludes all charges on the score of said redemptions either for interest, commissions on redemptions, or expenses, and all outside charges for other matters.

That original paper, being payable in New York, we know of no reason in law why it should not subject the parties to the current rate of exchange, which is both customary and legal in that State, as we understand the law of the subject, and as proved in the case.

It appears that, in the course of the business between the bank and Smith, Dwight & Co., they paid the bank, through various drafts. mainly on New York, a large amount of money, as is shown by the accounts set forth in the case. Of course it was competent for the parties to make such an application of

that money, in reference to the transactions between them, as they saw fit, as between redemptions that Smith, Dwight & Co. were bound to provide for, and the expenses, commissions on redemptions, and interest on that account, on the one hand, and the original loan, by way of payment, on the other.

So far as the bank received it as payment on the original loan, it is to be so applied in diminution of the amount due on said original note and drafts, computed at the rate of five per cent. per annum, down to the time the new notes were given. So far as the bank received it on account of interest on the redemptions, under the arrangement with Smith, Dwight & Co., and, in connection with the five per cent. provided in the original note and drafts, it results in an excess of six per cent. on the original loan, such excess is to be regarded as payment on said loan, and is to be applied accordingly in diminution of the amount due on said original note and drafts, at the time the new notes were given. The amount thus ascertained will be the true principal sum for which the defendant should be held liable on said new notes, which sum, with six per cent. interest from the date of said notes, will make the amount of damages which the plaintiff is entitled to recover.

As to the item of charge by the bank that went into the settlement, of commissions of one-half per cent. on the redemption of forty-five thousand dollars, it is proper to make a remark. It seems that Smith, Dwight & Co., in making said settlement, recognized and treated this charge as being proper, and, as to the funds furnished the bank on the score of redemptions, manifested their intention to have them apply as well in payment of this charge, as of the charges for other expenses accruing in the making of said redemptions, in the transmission of funds, and otherwise.

This commission cannot be regarded as, or in the nature of, interest for the use of the money loaned, but as a compensation to the bank for services performed in reference to the duty assumed by Smith, Dwight & Co., to provide for the redemptions, and to give the loaned money a circulation, conformably to the original arrangement in pursuance of which said money was loaned and advanced.

As the case furnishes the elements of a computation, by which the result in figures may be educed, we have taken the trouble to make such computation.

It appears that the bank charged interest on the redemption account, in the sum of one thousand seven hundred and sixty-seven dollars and fifty cents. The funds furnished by Smith, Dwight & Co. on account of redemptions were enough, lacking one hundred dollars, to pay the whole of the charges of the bank, including that amount of interest. Applying those funds in the first place to the other charges in full payment, there would be one hundred dollars of that amount of interest unpaid, and so it was charged over in making up the balance of indebtedness for which the new notes were taken. Of those funds, therefore, one thousand six hundred and sixty-seven dollars and fifty cents have been applied in paying interest on the redemption account. Of that sum it would take four hundred and four dollars and seven cents, in addition to the five per cent., to make the interest on the original loan up to six per cent. This sum of four hundred and four dollars and seven cents being deducted from the one thousand six hundred and sixty-seven dollars and fifty cents would leave one thousand two hundred and sixty-three dollars and forty-three cents, paid as interest in excess of six per cent. on the original loan, and it should therefore be applied upon the original loan by way of payment.

There was paid directly upon said original loan, and endorsed on the original ten thousand dollar note, the sum of four thousand and sixty-seven dollars. Applying that sum, and casting interest at five per cent., there was due, principal and interest, January 6th, 1855, twenty-seven thousand nine hundred and forty-three dollars and ninety-one cents, from which is to be deducted said sum of one thousand two hundred and sixty-three dollars and forty-three cents, leaving twenty-six thousand six hundred and eighty dollars and forty-eight cents. Add to this one-half of one per cent. exchange on New York one hundred and thirty-three dollars and forty cents, making twenty-six thousand eight hundred and thirteen dollars and eighty-eight cents, the true principal sum of said new notes. Interest cast on this from January 6th, 1855, to February 28th, 1861, would make the

Farmers' Bank *v.* Burchard.

amount thirty-six thousand six hundred and ninety-nine dollars and twenty-three cents, the sum for which judgment should be entered of that date.

As before intimated, it was competent for the principal parties to make any application of the funds furnished by Smith, Dwight & Co. on the score of redemptions, that the law would permit to the plaintiff bank.

And while the defendant should not be made chargeable for more than his contract liability, he would have no right to complain. It being competent for the bank to receive six per cent. on the original loans, and it being evident that Smith, Dwight & Co., in the settlement, were satisfied, and intended to allow the bank not only what was equivalent to that rate of interest, but even more, by way of funds furnished, we allow the matter to stand in that respect as the parties adjusted it, up to the limit to which the bank was authorized to receive interest.

The disposition we have thus made of the case covers all the substantial grounds of debate arising upon the exceptions. Many points were taken in the argument, which we have not specifically discussed, for the reason that they arose, and depended upon, the leading grounds, to which we have given particular attention, and which are disposed of in the disposition we make of those leading grounds.

The result is, that, as the judgment embraces more than the bank was entitled to recover, it is reversed, and, as the case enables us to ascertain the true sum, judgment is rendered in this court for that sum, without remanding the case.